IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO.: 5:22-cv-312

| | |
|---|---|
| WAKE COUNTY BOARD OF EDUCATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) **COMPLAINT** |
| | ) ) |
| L.P., a minor, by and through her parent, Jocelyn Pease, | ) ) ) |
| Defendants. | ) ) |

**I. INTRODUCTION**

1. This is an action seeking relief from the State Review Officer's decision to uphold the Administrative Law Judge's decision finding in the Defendants' (previously, "Petitioners") favor in the underlying administrative hearing.

2. This case arises under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and parallel state law, Chapter 115C, Article 9. The Wake County Board of Education ("Board") brings this action to challenge certain portions of the decision of the State Review Officer rendered in the administrative proceedings conducted in this matter under 20 U.S.C. § 1415(g)(2).

3. The Board challenges the entirety of the Review Officer's determination, including that it did not offer a free appropriate public education to L.P. from August 2017 to January 2020 by failing to develop and/or implement appropriate Individual Education Programs ("IEPs") and Behavior Intervention Plans ("BIPs"), as well as the Review Officer's determination that Defendants are entitled to private tuition reimbursement and related costs

including transportation along with compensatory education in the areas of social skills and speech language therapy. The Board also specifically contests the Review Officer's determination that an exception to the one-year statute of limitations applied, thus allowing Defendants to pursue claims prior to February 20, 2019. This error by both the ALJ and the Review Officer completely changed the scope and analysis of the case. Finally, the Board contests the Review Officer's decision for lacking the independent review and decision required by statute.

4. The Board brings this action as an aggrieved party seeking review by this Court pursuant to 20 U.S.C. § 1415(i)(2)(A).

## II. JURISDICTION & VENUE

5. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(3)(A).

6. All appropriate administrative remedies have been exhausted with respect to the issues presented by the Board. A local due process hearing was conducted by an Administrative Law Judge over twelve non-consecutive days beginning August 26, 2020 and ending on October 20, 2020. The Administrative Law Judge rendered her final decision on July 30, 2021. The Board timely filed an appeal to a State Hearing Review Officer on August 18, 2021, who issued a decision on May 13, 2022.

7. Venue is proper in the Eastern District of North Carolina pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2).

## III. THE PARTIES

8. Plaintiff is the Wake County Board of Education ("Board"), a body corporate, organized and operating under the General Statutes of North Carolina. The Board is a Local

Educational Agency under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq*., responsible under federal and state laws for provision of a free appropriate public education to students with disabilities.

9. Defendant L.P. is an IDEA-eligible student who lives in Wake County. L.P. is, and at all relevant times was, a citizen and resident of North Carolina.

10. Defendant Jocelyn Pease ("J.P.") is the adoptive parent of L.P. J.P. is, and at all relevant times was, a citizen and resident of North Carolina. L.P. and J.P. will be collectively referred to as "Defendants" in this Complaint.

IV. PROCEDURAL BACKGROUND

11. On February 20, 2020, Defendants filed a Petition for Contested Case Hearing against the Board, alleging various violations of the IDEA.

12. On May 13, 2020, Defendants filed an Amended Petition with leave of the administrative law judge.

13. On July 13, 2020, the Board filed a motion for partial summary judgment regarding the one-year statute of limitations for IDEA claims in North Carolina.

14. On August 19, 2020, the ALJ granted the Board's motion for partial summary judgment, dismissing all claims arising prior to February 20, 2019.

15. On August 26, 2020, the ALJ denied the Board's motions *in limine* regarding certain exhibits and testimony proposed by Defendants.

16. A hearing on the merits took place over twelve non-consecutive days beginning August 26 and ending on October 20, 2020.

17. After closing their own case and near the end of the Board's case-in-chief, Defendants made an oral motion for reconsideration of the ruling on the Board's motion for

partial summary judgment. The ALJ granted the motion and allowed Defendants to present additional testimony and evidence on October 18 and 20, 2020.

18. The ALJ entered her final decision on July 30, 2021, including finding that exceptions to the one-year statute of limitations were established and that Defendants could therefore pursue claims back to August 2017.

19. On August 18, 2021, the Board timely appealed the ALJ's decision to a State Review Officer.

20. On May 13, 2022, the appointed State Review Officer ("SRO"), John V. Robinson, upheld the ALJ's decision, deferring entirely to the ALJ's interpretation of the evidence in the record and conducting little independent analysis of the issues presented.

21. The Board, having been aggrieved by the decisions of the ALJ and the SRO, now files this civil action seeking relief from the SRO's decision upholding the ALJ's decisions that exceptions to the statute of limitations were established, that the Board denied L.P. a FAPE, that L.P.'s IEPs and BIPs were inappropriate and that the Board failed to appropriately implement the IEPs and BIPs, that the private school was appropriate, and that L.P. is entitled to relief including private school tuition.

**V.     FACTS**

*Background*

22. L.P. has a long history of emotional and behavioral dysregulation related to diagnoses of severe anxiety and disruptive mood dysregulation disorder. She exhibited passive suicidality, spontaneous meltdowns, and aggression early in her school career.

23. L.P. attended a charter school through second grade. Her behavior and emotional state deteriorated substantially in the latter portion of second grade, resulting in changes to her

program that included only attending school for half the day and being served almost entirely in a setting separate from her peers.

24. At the start of third grade, L.P. transferred to the Wake County Public School System ("WCPSS"). Based on her existing program, she was assigned to an Elementary Behavior Support ("EBS") classroom at Scotts Ridge Elementary School. The EBS program, which is used at approximately thirty (30) of WCPSS's schools, is designed to support elementary-age students with substantial behavioral difficulties to develop the skills and strategies needed to be successful in a general education environment. The EBS program is built on research-based practices, and includes direct instruction and programmatic supports regarding social skills and emotional/behavioral regulation.

25. Structural supports and interventions in the EBS program include a "safe space" within the classroom, which is a separate area with visual aids as well as sensory support and comfort items to assist students in self-regulating; a "time in" space which is a separate area (still within the classroom) where students are directed to sit when their behavior is inconsistent with classroom expectations; and a "quiet room" down the hall, which is a lawful seclusion space intended for use when students are so dysregulated that they are a safety threat to themselves or others and need to be isolated until they can return to a regulated state.

26. State law specifically authorizes the use of seclusion and restraint under defined circumstances, both as general safety interventions for all students irrespective of disability status as well as specific interventions that may be included in Individual Educational Programs ("IEPs") and Behavior Intervention Plans ("BIPs") for students with disabilities.

27. L.P.'s psychiatrist at the time of the transfer, Dr. Ann Marie Turnier, was familiar with the strong reputation of the Scotts Ridge EBS program and agreed it made sense for L.P.

28. L.P. was assigned to the classroom of veteran EBS teacher Jeff Straight, who had a decade of experience working with elementary students with significant behavioral needs, and who was honored as the Teacher of the Year at Scotts Ridge ES in 2017, just before L.P.'s arrival.

*Defendants' Knowledge of EBS Behavioral Interventions*

29. L.P. began attending the EBS program at Scotts Ridge ES in late August 2017.

30. As part of the EBS program, L.P.'s parents received copies of "daily point sheets" maintained by the EBS staff, which documented L.P.'s successes and challenges in 15-minute increments throughout the day, and awarded her points based on positive behaviors. L.P.'s parents were asked to review, sign, and return the point sheet to facilitate clear communication between school and home as well as ensure they were aware of issues arising at the school.

31. The daily point sheets specifically record when physical restraint is used on a student, and when a student is placed in seclusion—in L.P.'s case, this was noted as "T.O." for "time out," or as "quiet room."

32. L.P.'s parents signed and returned no fewer than four (4) daily point sheets between September 12 and November 3, 2017 that reported L.P. was "restrained" or taken to the "quiet room" or the "time out room" on those days for periods of up to 50 minutes at a time.

33. On December 5, 2017, L.P.'s mother e-mailed L.P.'s psychologist to communicate her concern that L.P. "continues to be sent home, put in the quiet room / padded closet at school and kicked off school transportation."

34. One week later, in a December 12, 2017 meeting that both of L.P.'s parents attended, the IEP discussed at length how the "time out" strategy in the "quiet room" was used. Staff explained that once a student is placed in the room, they have to sit quietly for three

6

minutes before they can return to class. They shared "that the door is never locked and that there is a window for her to see out." L.P.'s father shared that he had discussed this with L.P.'s psychologist, that they agreed that "time out" is "not a desirable place to be" but that it was sometimes necessary for safety reasons.

35. L.P.'s first formal Behavior Intervention Plan was developed at that same December 12, 2017 IEP meeting. The BIP specifically indicated "use of quiet room / seclusion" as a behavioral intervention when L.P.'s behavior became unsafe.

36. L.P.'s parents unquestionably knew as of December 2017 that L.P. was being secluded periodically at school, that "time out," "quiet room," and "seclusion" were being used synonymously by school staff at Scotts Ridge, that being in the quiet room / seclusion space meant that L.P. was closed in a small room by herself for a period of time, that the daily point sheets communicated how long L.P. was secluded for, and that L.P.'s BIP authorized the use of restraint and seclusion.

37. School staff did not deceive, misrepresent, or otherwise misinform L.P.'s parents regarding the use of seclusion and restraint or any other behavioral interventions at Scotts Ridge.

*L.P.'s Progress*

38. As part of the programming under her IEP and as built into the EBS program, L.P. received direct instruction in social skills and emotional/behavioral regulation on a daily basis. She also received emotional and behavior support in academic areas that were particularly challenging for her. She was "mainstreamed" into the general education classroom for substantial portions of her day, in time amounts that increased over the years.

39. L.P.'s IEPs contained goals and services that targeted her unique needs in social, emotional, and behavioral areas, and her BIPs included strategies that were designed in

collaboration with L.P.'s parents and private service providers and were updated throughout her time at Scotts Ridge.

40. L.P.'s IEPs and BIPs were appropriate to meet her needs, and Mr. Straight and his colleagues properly implemented those plans to support L.P.'s success.

41. In L.P.'s two and a half years at Scotts Ridge ES, she made substantial progress and the use of seclusion became almost entirely unnecessary over time. In third grade (2017-18), she was secluded seventeen (17) times for a total of 576 minutes, mostly in the first half of the school year. In fourth grade (2018-19), she was secluded six (6) times for a total of 63 minutes. In the first half of fifth grade, L.P. was secluded only once, for six minutes.

42. Documentation and staff reports also showed that L.P.'s academic abilities were on grade level, and that her academic success was inhibited only by her behavioral and emotional issues, not by her intellectual abilities. She required specially designed instruction related to behavior, emotional regulation, and social skills, but not for academic content.

*Discord Between Parents and School*

43. On February 20, 2019, L.P. engaged in a behavioral incident in which she fled from staff and hid in the cafeteria. When staff attempted to return her to her classroom, her behavior escalated to the point of being unsafe for herself and others such that she had to be physically restrained and removed from the cafeteria. She was also briefly secluded. The daily point sheet informed L.P.'s parents of the incident.

44. A parent of one of L.P.'s friends took a video of the last few seconds of L.P.'s removal from the cafeteria and sent it to L.P.'s parents, who were upset by the video.

45. An IEP meeting was called following the incident to discuss revisions to L.P.'s Behavior Intervention Plan. Changes were made to the strategies in the plan, and beginning with

8

the implementation of the updated plan, L.P. embarked on the longest period of excellent behavior she had sustained since arriving at Scotts Ridge, extending through the end of fourth grade in June 2019. At another IEP meeting late in the school year, L.P.'s father stated that he "felt we are doing great at school and he had no concerns at the current time."

46. L.P.'s success continued for nearly a month when she returned for fifth grade in the fall of 2019, but (likely due at least in part to changes in her medication and outside medical support), her behavior began to deteriorate and she had a significant behavioral incident on September 25, 2019, in which she knocked computer equipment to the floor and later punched her teacher. She was restrained and then briefly secluded for six minutes until she was calm and able to leave school at dismissal.

47. Another IEP meeting was called, at which L.P.'s parents requested that an outside expert conduct a behavioral evaluation and propose changes to L.P.'s program. The school agreed, and Dr. Deborah Leach was contracted at school expense to conduct the evaluation. L.P.'s parents also requested L.P. be removed from the EBS program.

48. In the weeks leading up to the scheduled IEP meeting to review Dr. Leach's results and draft a new IEP and BIP in January 2020, L.P. made numerous statements indicating that her parents were going to withdraw her from WCPSS and send her to a private school. She missed a day of school to visit a private school, then stopped attending WCPSS altogether. Her parents attempted to enroll her at the private school prior to the IEP meeting and without formally withdrawing her from WCPSS, but the private school did not permit them to do so. They then withheld from WCPSS the withdrawal form they had drafted a week before the IEP meeting until after the IEP meeting.

49. At the January 2020 IEP meeting, the IEP team developed a new IEP, agreed to remove L.P. from the EBS program and place her in the general education classroom as requested by Defendants, and adopted a behavior plan matching Dr. Leach's proposal almost to the word.

50. At the end of the meeting, L.P.'s parents rejected the new IEP and BIP and demanded that the school system place L.P. in private school at public expense. The school team declined because the new plans were appropriate for L.P. and the school was fully capable of meeting her educational and disability-related needs. They also offered her a transfer to another school within WCPSS, which Defendants declined. L.P. started at the private school shortly thereafter.

51. L.P.'s new private school was not an appropriate placement for her. It was too restrictive (she had no access to non-disabled peers), did not keep data regarding her performance, did not provide specially designed instruction related to her needs, and taught her one to two grade levels below where she should have been taught. Upon information and belief, the private school was unable to successfully serve L.P. such that she had to be withdrawn and homeschooled.

*Administrative Proceedings*

52. On February 20, 2020, Defendants filed a petition for a contested case hearing in the North Carolina Office of Administrative Hearings, claiming among other things that WCPSS had denied L.P. a FAPE and had inappropriately restrained and secluded her.

53. The hearing took place across twelve (12) days between August 26 and October 20, 2020. Prior to the hearing, the ALJ granted the Board's motion for partial summary judgment

10

limiting the relevant time period to the IDEA's one-year statute of limitations and dismissing claims arising prior to February 20, 2019.

54. During the hearing, the ALJ committed numerous errors, including flawed evidentiary rulings such as allowing L.P.'s parents to present evaluations conducted after L.P. had left WCPSS (and testimony about those evaluations) and excluding expert testimony from the Board's psychiatric expert.

55. Also during the hearing, the ALJ erroneously reconsidered her previous summary judgment order, accepting the parents' claims that they did not know about the restraint and seclusion prior to February 20, 2019. As a consequence, the statute of limitations was tolled and the parents were able to make claims reaching all the way back to L.P.'s first enrollment in WCPSS in August 2017. Petitioners were also permitted to re-open their case in chief to present additional evidence.

56. The ALJ's final decision was entirely in favor of Defendants. Among other things, the ALJ decided that the EBS teacher, Mr. Straight, had been intentionally deceptive to the parents regarding seclusion and restraint and that (contrary to the clear documentation and testimony of other witnesses and without any contradicting evidence) he had not provided social skills instruction to L.P. The ALJ decided that the Board had denied L.P. a FAPE by secluding and restraining her inappropriately, that the Board had not developed legally sufficient IEPs and BIPs, that the private placement selected by the parents was appropriate, and that, as a result, the parents were entitled to receive private school tuition reimbursement.

*Appeal to State Review Officer*

57. The Board timely appealed the ALJ's decision to the State Review Officer as provided for under North Carolina law.[1] Among other things, the Board identified for the State Review Officer the significant errors made by the ALJ with respect to the statute of limitations and evidentiary issues, the ALJ's misunderstanding and misapplication of state law regarding seclusion and restraint, and the ALJ's ultimately incorrect conclusions based on the evidence in the case.

58. Though state law provided for a 30-day review by the State Review Officer, the SRO did not release a decision for over nine months, and only after counsel for the Board had raised the delay with the North Carolina Department of Public Instruction. The SRO's decision when finally released was cursory, engaged in little analysis, and simply adopted without review the ALJ's findings and conclusions based largely on the length of the ALJ's written decision.

59. The SRO incorrectly failed to address the improper expansion of the statute of limitations, did not independently analyze the record or the contested IEPs, and did not independently review the issue of the private school's appropriateness. The SRO's decision is incorrect on almost all points and awarded undue remedies to the petitioners.

60. Both the ALJ's decision and the SRO's decision are based on findings that are irregularly made, unsupported by the evidence in the record, and legally incorrect.

## VI.  CLAIM FOR RELIEF

61. The Board seeks relief from the State Review Officer's decision to uphold the Administrative Law Judge's decision in its entirety, including but not limited to the issues of the

---

[1] Shortly after the appeal was begun, the North Carolina legislature changed the law and removed the second-tier review of the State Review Officer. That change does not impact this case.

expansion of the statute of limitations from one year to three years; the appropriateness of the implementation of behavior plans from 2017 to 2020; the appropriateness of L.P.'s IEP and BIP during the one-year statutory period; whether the Board provided L.P. a FAPE; and whether Defendants were entitled to private school tuition following L.P.'s withdrawal from WCPSS in January 2020.

62. The Board established at the hearing before the ALJ (even though it did not bear the burden of proof) that L.P. was offered and provided a free appropriate public education in the least restrictive environment throughout her time at Scotts Ridge, that she made substantial progress with respect to her IEP goals and unique educational needs, that the parents inappropriately rejected the January 2020 IEP, and that the private school was not appropriate.

63. The ALJ's and SRO's decisions on the determinative issues in the case are incorrect and should be overturned.

64. The decisions of the ALJ and SRO are attached as Exhibits A and B.

## VII. PRAYER FOR RELIEF

The Board therefore prays the Court to:

1. Find that L.P.'s parents knew or should have known about the seclusion and restraint they now complain of and were not prevented from timely filing due process by any act or omission of the school staff; that the one-year statute of limitations should have been applied in this case; and, therefore, any and all claims preceding February 20, 2019 were not timely brought, should not have been before the ALJ or SRO, and are not properly before this Court;

2. Find that the IEPs and BIPs within the statutory period offered L.P. a FAPE and were properly implemented to provide a FAPE;

13

3. Find that the IEP and BIP proposed in January 2020 were appropriate and that the private placement was not appropriate, and therefore overturn the order for private school tuition reimbursement;

4. Declare the Board the prevailing party on all issues.

This the 10th day of August 2022.

/s/ Stephen G. Rawson
Stephen G. Rawson
THARRINGTON SMITH, L.L.P.
PO BOX 1151
Raleigh, NC 27602-1151
Tel. 919.821.4711
Fax. 919.829.1583
srawson@tharringtonsmith.com
NC State Bar Number 41542
Attorneys for Plaintiff